# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STX BUSINESS SOLUTIONS, LLC and JON THOMPSON, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2024-0038-JTL |
| FINANCIAL-INFORMATION-TECHNOLOGIES, LLC and FINTECH HOLDCO, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION GRANTING MOTION TO DISMISS

Date Submitted: October 11, 2024
Date Decided: October 31, 2024

Thad J. Bracegirdle, Justin C. Barrett, BAYARD, P.A., Wilmington, Delaware; *Attorneys for Plaintiffs.*

Ryan D. Stottmann, Taylor A. Christensen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jordan D. Weiss, Matthew Harrington White, Jacqueline R.D. Fielding, GOODWIN PROCTER LLP, New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

A limited liability company and its manager sued the buyer of the company's assets and its parent entity over an unpaid earnout. The plaintiffs assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, and fraudulent inducement. The buyer and its parent moved to dismiss.

This decision grants the motion. The earnout provision only prohibits the buyer from taking action in bad faith, and the plaintiffs failed to plead facts supporting an inference of bad faith. Both of their implied covenant theories conflict with the express terms of the agreement. The tortious interference claim fails for lack of an underlying breach of contract. And they failed to plead fraud through silence because the complaint offers no reason to infer that the buyer had a duty to speak or engaged in an affirmative act of fraudulent concealment.

## I.    FACTUAL BACKGROUND

Under an Asset Purchase Agreement dated as of July 1, 2021 (the "Agreement"), Financial-Information-Technologies, LLC ("Fintech" or the "Buyer") agreed to purchase the assets of STX Business Solutions, LLC ("STX" or the "Seller"). As consideration, the Buyer agreed to pay $5.3 million (subject to certain adjustments), assume certain liabilities, and issue the Seller common units in the Buyer's parent entity ("Parent") with an agreed value of $1.7 million. The Buyer also committed to employ Jon Thompson, the Seller's founder, as Vice President of Business Development.

The Agreement called for the Seller to receive additional consideration if the purchased assets met specified revenue goals (the "Earnout").[1] The potential Earnout topped out at $5.5 million (the "Maximum Earnout"). The Agreement contained the following buyer-friendly clause addressing how the Buyer could operate the business after closing:

> Seller and each Seller Party acknowledges that Buyer is entitled, after the Closing, to use the Purchased Assets and operate the Business in a manner that is in the best interests of Buyer or its Affiliates and shall have the right to take any and all actions regardless of any impact whatsoever that such actions or inactions have on the earn-out contemplated by this Section 2.7; provided, that, prior to the Earn-Out Measurement Date, Buyer shall not take any action in bad faith with respect to Seller's ability to earn the Earn-Out Consideration or with the specific intention of causing a reduction in the amount thereof.[2]

The Agreement thus did not obligate the Buyer to use best efforts, commercially reasonable efforts, or even good faith efforts to achieve the Earnout. The Buyer only had to refrain from "action in bad faith with respect to Seller's ability to earn the Earn-Out Consideration or with the specific intention of causing a reduction in the amount thereof."[3]

The Agreement also provided that "upon the closing of a Sale of the Company," any amounts necessary to satisfy the Maximum Earnout would become due and payable.[4] The Agreement defined "Sale of the Company" by incorporating a definition

---

[1] Agr. § 2.5.

[2] *Id.* at § 2.7(f).

[3] *Id.*

[4] *Id.* at § 2.7(c).

2

from Parent's Amended and Restated Limited Liability Company Agreement (the "Parent Agreement"). That document defined a Sale of the Company as

> any transaction or series of transactions pursuant to which any Person or group of related Persons [other than current majority owners] in the aggregate acquire(s) (i) equity securities of [Parent] possessing the voting power (other than voting rights accruing only in the event of a default or breach) to elect Board members which, in the aggregate, control a majority of the votes on the Board (whether by merger, consolidation, reorganization, combination, sale or transfer of [Parent]'s equity securities, securityholder or voting agreement, proxy, power of attorney or otherwise), or (ii) all or substantially all of [Parent]'s assets determined on a consolidated basis.[5]

Before entering into the Agreement, the Seller had started pursuing a "potentially lucrative" contract with Walmart for data management services.[6] On April 5, 2023, almost two years after the transaction closed, Walmart issued a request for proposal for a five-year contract for data management services.[7] Walmart told the Buyer that its products appeared to be the only viable solution for Walmart's needs and invited the Buyer to submit a proposal by May 1.[8]

The Buyer obtained the information necessary to prepare and submit a proposal.[9] Then, at 9:35 p.m. on May 1—the final day for a response—the Buyer

---

[5] Parent Agr. § 1.1.

[6] Am. Compl. ¶ 18.

[7] *Id.*

[8] *Id.*

[9] *Id.* ¶ 19.

3

notified Walmart by email that the Buyer would not be submitting a proposal.[10] The email cited "constraints" imposed by an "exclusive relationship" with Information Resources, Inc. ("IRI").[11]

Before the May 1 email, the Seller and Thompson knew nothing about the Buyer's "exclusive relationship" with IRI.[12] The Buyer also had never mentioned that any relationship would cause the Buyer not to respond to a request for proposal.[13] After learning about the failure to respond to Walmart, Thompson asked Parent's CEO for additional information. He initially got no response.[14]

By agreement dated May 16, 2023, affiliates of General Atlantic, L.P. (the "New Investor") agreed to acquire a 48.1% membership interest in the Parent. Before the transaction, non-party TA Associates Management ("TA") owned virtually all of the Parent's equity. After the Transaction, both the New Investor and TA held an equal 48.1% membership stake.[15] Reflecting their equal ownership, TA and the New Investor shared control over the Parent's board of managers. TA and the New Investor each had the right to appoint two managers. One seat would be held by the

---

[10] *Id.* ¶ 20.

[11] *Id.* ¶ 21.

[12] *Id.* ¶ 23.

[13] *Id.* ¶ 22.

[14] *Id.*

[15] *Id.* ¶ 24.

4

Buyer's CEO, Tad Phelps, and the remaining two seats would be chosen jointly by TA and the New Investor.[16]

On May 17, 2023, around two weeks after Thompson had reached out to Parent's CEO, Phelps told Thompson that Buyer declined to respond to Walmart because Parent was negotiating with the New Investor and did not want the pursuit of the Walmart contract to "muddy the waters" and threaten the transaction.[17]

The Seller and Thompson filed this action on January 17, 2024. The operative complaint asserts claims for breach of express contractual provisions, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, and fraudulent inducement. The defendants moved to dismiss the complaint for failing to state a claim upon which relief can be granted.

## II.    LEGAL ANALYSIS

When reviewing a motion to dismiss under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[18]

---

[16] *Id.*

[17] *Id.* § 25.

[18] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–897 (Del. 2002).

The court must accept as true even vague allegations if they provide the opposing party notice of the claim, but the court need not "accept as true conclusory allegations without specific supporting factual allegations."[19]

## A.      Count I: Breach Of Contract

Count I asserts a claim for breach of contract. The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as compensatory damages, nominal damages, or in an appropriate case, specific performance.[20] Plaintiffs' breach of contract claim advances two theories. Neither works.

### 1.      The First Theory: Failing To Respond To Walmart

The first theory contends that Buyer breached Section 2.7(f) of the Agreement by failing to respond to Walmart's request for proposal for the express purpose of depriving the Seller of the Earnout. That theory fails to state a claim on which relief can be granted.

The plain language of Section 2.7(f) authorized the Buyer to operate the acquired business as it deemed fit, even if that would interfere with the Seller's ability to earn the Earnout, so long the Buyer did not take action in bad faith or with the

---

[19] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)) (internal quotation marks omitted).

[20] *Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024).

specific intention of causing a reduction in the Earnout.[21] To state a claim for breach, the complaint must allege facts supporting a reasonable inference that the Buyer acted in bad faith.

Although the defendants prevail on this issue, they start with an unpersuasive distinction between action and inaction. They say the Earnout only addresses action, not inaction.

The defendants have found some cases that attempt to draw this distinction,[22] but there is no difference between the concepts when a conscious decision is involved. "Delaware law recognizes that conscious inaction represents as much of a decision as conscious action."[23] "From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."[24] Virtually any conscious decision can be framed either in terms of action or inaction. If I consciously chose not to do something, I have consciously acted.[25] If I consciously choose to act in one way,

---

[21] It is not clear what the difference is between the two clauses. To act in bad faith with respect to an earnout means to take action intentionally for the purpose of preventing the earnout from being met. The second clause says that expressly.

[22] MTD OB at 17–18.

[23] *Garfield v. Allen*, 277 A.3d 296, 336 (Del. Ch. 2022) (citations omitted).

[24] *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991).

[25] *See Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (subsequent history omitted) ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule."); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes, and that the Board decided not to defer

7

I have also consciously chosen not to act in another way. The reference to "action" in the earnout provision encompasses both.

In this case, the distinction between action and nonaction is particularly dubious because only bad faith conduct can breach the earnout provision. A *scienter* based standard like bad faith means that any breach will involve a conscious decision. If the Buyer intentionally failed to respond to Walmart for the purpose of impairing the earnout, then the Buyer made a knowing decision not to act. That itself is knowing action.[26]

The real question is whether the complaint's allegations support an inference of bad faith. The Seller argues that if the Buyer had secured a contract with Walmart,

---

paying interest on the Junior Notes to benefit [Defendant]. A conscious decision not to take action is just as much of a decision as a decision to act."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *All. Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 766 (Del. Ch. 2009) ("'Rejecting' the OCC Proposal is the same thing as not agreeing to that Proposal."), *aff'd* 976 A.2d 170 (Del. 2009); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); Jean-Paul Sartre*, Existentialism Is a Humanism* 44 (Carol Macomber trans., Yale Univ. Press 2007) ("[W]hat is impossible is not to choose. I can always choose, but I must also realize that, if I decide not to choose, that still constitutes a choice.").

[26] That does not render the action requirement meaningless. Envision a scenario in which a buyer fails to meet an earnout because a hurricane destroys a key part of the business. That sad outcome would not flow from any action by the buyer, so it would not trigger an accelerated earnout payment that turned on the buyer taking action to impair the earnout.

then the Buyer easily would have exceeded the revenue targets for the earnout.[27] It follows, says the Seller, that the court can infer bad faith.

That inference is not a reasonable one. The Buyer was in the midst of negotiating a major transaction with the New Investor. Phelps told Thompson that Buyer did not want to pursue the Walmart contract because that could cause complications for the transaction.[28] Deciding whether to pursue the Walmart contract required a business judgment that the Buyer was empowered to make. Section 2.7(f) of the Agreement authorized the Buyer "to use the Purchased Assets and operate the Business in a manner that is in the best interests of Buyer or its Affiliates and shall have the right to take any and all actions regardless of any impact whatsoever that such actions or inactions have on the earn-out" as long as the Buyer did not act in bad faith to defeat the earnout.[29]

"A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[30] It is not possible to infer that the Buyer failed to pursue the Walmart opportunity in bad faith. The first breach of contract theory therefore fails.

---

[27] Am. Compl. ¶ 18.

[28] Am. Compl. ¶ 25.

[29] Agr. § 2.7(f).

[30] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

### 2. The Second Theory: Structuring The Transaction With The New Investor

The plaintiffs' second theory asserts that the Buyer acted in bad faith by structuring the transaction with the New Investor to evade the definition of a Sale of the Company, thereby preventing the transaction from triggering the Maximum Earnout. The plaintiffs assert that TA intended to sell control over the Buyer to the New Investor, but only sold a 48% interest so as to avoid triggering the Maximum Earnout.

That is not a reasonably conceivable inference. The transaction with the New Investor established a joint-control regime at both the manager level and member level. Shared control differs from unilateral control, making it impossible to infer bad faith from a decision to establish shared control. If TA had sold control to the New Investor, then TA would have been in the vulnerable position of a minority investor. Yes, TA might have bargained for contractual protections, but TA still would have been at risk. The only reasonable inference from the structure of the transaction is that TA did not want to sell control; TA was only willing to accept shared control. Given the obvious business purpose for insisting on shared control, it is not reasonable to infer that TA decided to cap the New Investor's ownership stake at 48.1% to avoid triggering the Maximum Earnout.

### B. Count II: Breach Of The Implied Covenant Of Good Faith And Fair Dealing

Count II asserts a claim for breach of the implied covenant of good faith and fair dealing.

> When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled. During this phase, the court decides whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill.[31]

In this case, the plaintiffs advance two theories. Neither identifies a gap to be filled. Both conflict with the Agreement. Neither states a claim on which relief can be granted.

### 1. The First Theory: Intentionally Discontinuing The Walmart Negotiations

The plaintiffs first claim that the Buyer breached the implied covenant by intentionally discontinuing the negotiations with Walmart for the express purposes of depriving Seller of the Earnout and facilitating the transaction with the New Investor. That claim cannot survive because it conflicts with the Agreement.

"[I]f the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable."[32] Here, Section 2.7(f) of the Agreement establishes an express standard for conduct that violates the Earnout. The plaintiffs asserted a claim for breach of Section 2.7(f), contending that

---

[31] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd* 2015 WL 803053 (Del. Feb. 26, 2015).

[32] *Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (citing *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *12 (Del. Ch. Dec. 22, 2010)); *see also Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888–889 (Del. Ch. 2009) (dismissing claim for breach of the implied covenant of good faith and fair dealing when the claim was premised on the defendants' failure to pay money due under the contract, since the contract would control such a claim).

the Buyer acted in bad faith by failing to pursue the Walmart opportunity. A claim under the implied covenant would conflict with the express standard. Put differently, there is no gap to fill.

### 2. The Second Theory: Structuring The Transaction To Prevent The Maximum Earnout

The plaintiffs next claim that although the transaction with the New Investor did not meet the definition of a Sale of the Company, the parties intended to trigger the Maximum Earnout if TA gave up sole control over the Company. The plaintiffs argue that they contracted with TA, not anyone else, so if TA no longer had sole control of the Company, then the Seller would face increased risk of a change in operations that would impair the earnout. The plaintiffs contend that the parties would have agreed that a shift to shared control would trigger the Maximum Earnout.

The Agreement addresses that exact point. It contemplates paying out the Maximum Earnout if there is a change in control that results in a new controller. The Agreement does not contemplate paying out the Maximum Earnout if there is a transition to shared control. That is rational, because with shared control, TA could block changes in the Company's direction, meaning the New Investor's purchase of shared control did not increase the plaintiffs' risk.

The parties could have drafted a trigger based on TA's loss of sole control, but they did not do that. The Agreement clearly states that the Maximum Earnout will become due and payable upon a Sale of the Company. The necessary implication is that other types of transactions do not trigger the Maximum Earnout. Once again, there is no gap for the implied covenant to fill.

12

## C. Count III: Tortious Interference With Contract

Count III asserts a claim for tortious interference with contract. To sufficiently plead a claim for tortious interference with contract, a plaintiff must plead (1) the existence of a contract, (2) about which defendant knew, (3) an intentional act that is a significant factor in causing breach, (4) without justification, (5) that causes injury.[33] Without an underlying breach of contract, the claim cannot go forward. [34]

The plaintiffs argue that the Parent caused the Buyer to breach the express and implied terms of the Agreement in the manner addressed above. Because the Buyer's actions did not breach the Agreement, the claim for tortious interference fails.

## D. Count IV: Fraudulent Inducement

Last, Count IV asserts a claim for fraudulent inducement. The required elements are identical to a claim for common-law fraud: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result.[35]

---

[33] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

[34] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *25 (Del. Ch. Nov. 17, 2014).

[35] *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 461–462 (Del. 1999); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

A fraud claim does not require an affirmative misrepresentation. Fraud can result from the "deliberate concealment of material facts, or silence in the face of a duty to speak."[36]

The plaintiffs contend that the Buyer failed to disclose the relationship with IRI that ultimately led to the Buyer's refusal to pursue the Walmart contract. But the plaintiffs have not identified any reason why the Buyer would have had a duty to speak. The plaintiffs also have not alleged any act of intentional concealment.

The plaintiffs cite *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917 (Del. Super. Ct. Aug. 7, 2019), for the proposition that "[w]hen the necessary facts are typically within the opposing party's control, less particularity is required and the claim can prevail so long as the claimant describes the circumstances of fraud with 'detail sufficient to apprise the defendant of the basis for the claim.'"[37] That is true, but a plaintiff who asserts an omission-based fraud claim still must allege facts giving rise to a duty to speak or that support an inference of intentional concealment. Because the Sellers have done neither, their fraud claim is dismissed.

### III. CONCLUSION

The complaint fails to state any viable claims. The defendants' motion to dismiss is therefore granted.

---

[36] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018) (cleaned up) (citations omitted).

[37] *Id.* at *9.

14